**CLARKSON LAW FIRM, P.C**.
Ryan J. Clarkson (SBN 257074)
rclarkson@clarksonlawfirm.com
Shireen M. Clarkson (SBN 237882)
sclarkson@clarksonlawfirm.com
Bahar Sodaify (SBN 289730)
bsodaify@clarksonlawfirm.com
9255 Sunset Blvd., Ste. 804
Los Angeles, CA 90069
Tel: (213) 788-4050
Fax: (213) 788-4070

Settlement Class Counsel

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS IGLESIAS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>FERRARA CANDY CO., and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 3:17-cv-00849-VC<br><br>**[CLASS ACTION]**<br><br>**DECLARATION OF RYAN J. CLARKSON IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARD**<br><br>Hon. Judge Vince Chabbria<br><br>Complaint filed:   February 21, 2017<br><br>Hearing Date:       October 25, 2018<br>Hearing Time:       10:00 AM<br>Hearing Location:  Courtroom 4 |

DECLARATION OF RYAN J. CLARKSON

**DECLARATION OF RYAN J. CLARKSON**

I, Ryan J. Clarkson, declare as follows:

1. I am managing partner at Clarkson Law Firm, P.C. and Class Counsel for the settlement class in the above-captioned matter. I am licensed to practice in all state and federal courts in California and Michigan, and I am a member in good standing of the State Bars of California and Michigan. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

2. I make this declaration in support of Plaintiffs' motion for attorneys' fees, expenses, and service award submitted to the Court pursuant to the terms of the parties' settlement agreement.

## I. BACKGROUND AND OVERVIEW OF THE LITIGATION

### A. Investigation of Claims and Section 1782 Negotiations

3. In the Spring of 2016, my office was contacted by Thomas Iglesias regarding a potential false advertising lawsuit against Ferrara Candy Company ("Ferrara" or "Defendant") based on allegedly deceptive packaging. During the weeks and months that followed, my office investigated the potential claims, conducted background research on Mr. Iglesias, reviewed the products' packaging, consulted a packaging expert, and reviewed all relevant statutory and case authority.

4. My office conducted a thorough case intake interview with Mr. Iglesias. We inquired about his motivation for seeking legal action which was to right a perceived wrong based on allegedly deceptive packaging and obtain refunds for every purchaser who was deceived like him. We performed a conflicts check. We also reviewed all online search tools and social media for information on Mr. Iglesias, including Facebook, Twitter, LinkedIn, Google, and other available tools.

5. My office also conducted background research on Ferrara. We researched their collectability and learned that they were one of the largest candy companies in the world. We also learned as much as we could about the types of products they sold, the channels of distribution through which they sold their products, their gross annual revenues, the popularity of the products

at issue, their leadership structure, their advertising and marketing campaigns, their public relations initiatives, among other things.

6. My office also reviewed all relevant statutory, case, and regulatory authority. Although my firm had prior experience with slack fill litigation, the legal landscape was ever-changing and required hours of additional research regarding the viability of Mr. Iglesias' claims. There were a number of slack fill cases in California, New York, and Missouri. We reviewed all of these authorities.

7. My office also ordered exemplars of the products at issue. Once we received the exemplars, we reviewed the products' packaging in detail and took informal measurements of the amount of empty space contained therein.

8. My office also researched packaging engineering design consultants. We located several academics from various universities and other packaging engineering consultants from the food packaging industry. We contacted a number of potential consulting experts, a number of which we interviewed. We discussed the viability of the potential claims over the course of several phone calls.

9. Based on our review of the facts and applicable law, my firm agreed to take on the case on a contingency fee. We knew at the time that the case would be an expert-driven lawsuit with requiring input from qualified professionals in the fields of packaging design engineering, economics, conjoint analysis survey methodologies, and marketing. We also knew that there would be a substantial risk of nonpayment given the fact that other cases had been dismissed on pleadings challenges. But we decided that the claims were meritorious, our client was highly credible, and something ought to be done to address what appeared to be an industry-wide problem.

10. In Summer of 2018, my office prepared a statutory notice letter pursuant to the California Consumers Legal Remedies Act, which we served on Ferrara on August 1, 2016. In the months that followed, counsel for Ferrara and we had discussions under Section 1782(e), focused on how to cure the allegedly deceptive packaging. There were many detailed conversations and

substantive settlement communications which involved evaluation of the claims and defenses. The parties ultimately were unable to reach a resolution.

### B.   Filing of the Lawsuit and Case Assignment to Judge Vince Chhabria

11.   In January and February 2017, my office prepared the instant lawsuit in the United States District Court for the Northern District of California, which we filed on behalf of Mr. Iglesias on February 21, 2017. Plaintiff alleged violations of state and federal packaging laws and consumer protections laws on behalf of all United States purchasers of the theater box candy products manufactured by Ferrara. The case was assigned to the Honorable District Judge Vince Chhabria. During the following days, we thoroughly researched the Honorable District Judge Vince Chhabria's background, judicial decisions, and standing orders.

### C.   Defendant's Pleading Challenges

12.   In March 2017, Ferrara requested additional time to respond to the complaint, and we provided the professional courtesy of an extension.

13.   On April 19, 2017, Defendant filed a Rule 12(b)(6) motion to dismiss Plaintiff's complaint (Dkt. 14). On May 10, 2017, Plaintiff filed his first amended complaint ("FAC") pursuant to Rule 15(a) to add additional remedies available under the statutes in lieu of an opposition (Dkt. 18).

14.   On May 24, 2017, Defendant filed a Rule 12(b)(6) motion to dismiss the FAC, claiming the Products are not misleading and do not contain nonfunctional slack-fill (Dkt. 28), which Plaintiff opposed on June 7, 2017 (Dkt. 34), to which Defendant replied on June 14, 2017 (Dkt. 37), and the Court denied on July 25, 2017 (Dkt. 40). Defendant answered Plaintiff's FAC on August 8, 2017 (Dkt. 41).

### D.   Written Discovery, Depositions, and Motion to Compel

15.   In the ensuing weeks, the Parties negotiated and filed a stipulated protective order for the sharing of information and documents (Dkt. 43). Plaintiff had already served multiple sets of discovery by the time the pleadings were resolved, including special interrogatories, requests for admissions, and document requests. Over the course of the next several months, the Parties met and conferred over Plaintiff's discovery requests and Defendant's (supplemental) responses,

which culminated in Plaintiff's motion to compel on November 15, 2017 (Dkt. 47), which the Court granted on November 29, 2017 (Dkt. 48).

16. As a result of Plaintiff's successful motion to compel, Defendant produced over 6,000 documents. Many of the documents were multi-page spreadsheets which required input from experts to understand. My office spent weeks thoroughly reviewing the documents before taking Rule 30(b)(6) depositions, which my associate Bahar Sodaify and I traveled to Chicago for from December 19-21, 2017, obtaining critical admissions from Defendant's designees.

17. In addition, on November 13, 2017, Plaintiff sat for a full day deposition. Our office spent several hours in the days leading up to the deposition to prepare Mr. Iglesias who had never sat for such a deposition before. He provided highly credible testimony under oath, such that defense counsel remarked on it.

### E. Mediations and Class Certification

18. On October 10, 2017, the Parties attended a full-day mediation in San Francisco with mediator Martin Quinn. My office prepared and submitted a detailed mediation brief with input from consulting experts, a detailed review of the claims and defenses, the prospects of class certification and success on the merits, among other things. The parties made some progress but were unable to reach an agreement.

19. On the heels of Plaintiff's persuasive and credible deposition testimony on November 13, 2017 and Plaintiff's successful motion to compel discovery on November 29, 2017, the Parties scheduled a second mediation, which was held on February 2, 2018, with the Honorable William Cahill (Ret.) in San Francisco.

20. In January 2018, Plaintiff prepared for the possibility that the case would not settle at the parties' second mediation in early February and that Plaintiff would have to file his motion for class certification. Plaintiff retained four experts in various disciplines in order to proffer substantial evidence on the Rule 23 elements in order to satisfy the expected rigorous analysis.

21. Class Counsel worked intensely with an expert in conjoint analysis survey methodologies, Dr. Michael Bechtel, and commissioned a large-scale consumer survey in which nearly 4,000 consumers were surveyed about their purchase decision making with respect to the

products at issue. The survey results demonstrated that the size of the box was material in consumers' decision-making. It also demonstrated that the amount of candy in the products' boxes was inconsistent with consumers' expectations.

22. Class Counsel also worked closely with an expert packaging design engineer, Dr. Claire Sand, who conducted a detailed slack-fill study on the products' packaging. She determined that the products' packaging contained substantial nonfunctional slack fill.

23. Class Counsel also worked closely with an economics expert, Dr. Justin Lenzo, who evaluated Dr. Bechtel's and Dr. Sand's opinions, and determined based on their study results that consumers paid a price premium for the nonfunctional empty space in the packaging.

24. Class Counsel also worked closely with an expert in marketing, Dr. Forrest Morgeson, who opined that the number of complaints were highly underreported due to barriers to complaint inherent in the stream of commerce for low cost consumer goods. Dr. Morgeson also opined as to consumer purchase decision-making.

25. Each of Plaintiff's retained experts prepared full expert reports in support of Plaintiff's motion for class certification, which was filed along with a declaration from Class Counsel and Plaintiff Thomas Iglesias, on March 5, 2018.

26. Up through and including that time, Judge Cahill had remained involved in ongoing mediation discussions following the parties' second mediation on February 2, 2018. Within weeks of Plaintiff's motion for class certification being filed on March 5, 2018 (Dkt. 53-54), the parties settled the case (Dkt. 58).

**F.     The Settlement**

27. Based on all available sources my office has reviewed, this settlement is the largest slack fill settlement on record. It provides for a common claim fund of $2.5 million and a permanent injunction in the form of changes to Ferrara's quality control procedures and target fills levels to 75% for all theater box products and 50% for bag-in-the-box theater box products. This is a substantial increase over what Plaintiff's packaging design engineering expert calculated the slack fill levels to be and will bring the packaging more in line with consumer expectations according to Plaintiff's conjoint analysis survey expert.

28. The settlement is the largest-ever slack-fill settlement on record[1] and provides a superior recovery for the class. Defendant will pay a total of $2.5 million in cash to a common claim fund. Subject to court approval, the settlement fund will be used to pay the settlement payments to class members, notice and administration costs ($522,000), a service award to Mr. Iglesias ($5,000), reimbursement of litigation expenses ($102,172.12), and an award of reasonable attorneys' fees ($625,000).

29. On May 10, 2018, Plaintiff filed his motion for preliminary approval which included a detailed notice and administration plan and the proposed settlement which included substantial monetary relief and injunctive relief (Dkt. 72) as agreed upon by the Parties. The Court granted Plaintiff's motion for preliminary approval (Dkt. 80, 82).

**G.     Post-Preliminary Approval Activity to Date**

30. Our office has closely monitored the class notice program being carried out by the notice administrator and the claims administration process with minimum weekly check-ins and discussions whenever class member questions have arisen. The class member response has been overwhelmingly positive. To date, 71,116 claims and zero objections have been submitted.

31. This is an important win for consumers. Plaintiff has achieved through this settlement the type of relief one might reasonably expect after a trial on the merits, making settlement at this juncture all the more enticing. As a result of Plaintiff's efforts, consumers will be able to obtain refunds that exceed the amounts they might have received through trial given the average price premium according to Plaintiff's economics expert and the average price per box as compared to the 50 cents per box refund amount. In addition, consumers will have the benefit of fill levels in line with their expectations from a highly visible competitor in the marketplace—now part of the second largest candy company in the world—which will aid in leveling the playing field among candy companies, a substantial benefit to the general public.

32. Class Counsel achieved this outstanding result with skill and efficiency, against the determined opposition of a deep-pocketed defendant represented by highly experienced and

---

[1] Compare to *Kline v. Dymatize Enters., LLC*, No. 15-CV-2348, 2016 U.S. Dist. LEXIS 142774 (S.D. Cal. Oct. 13, 2016) (slack-fill case involving protein powder in large opaque containers provided only injunctive relief).

capable counsel. Plaintiff's claims were complex and raised difficult legal questions. Prosecuting these claims required a high degree of skill, experience, and diligence, and presented daunting risks. While vigorously litigating this case, Class Counsel had to navigate the ever-changing legal terrain and overcome pitfalls common to other slack-fill lawsuits. As reflected in hotly contested pleadings challenges, this case raised novel issues, which Plaintiff and Class Counsel astutely addressed and overcame. For example, this case asked whether Defendant's product packaging contains nonfunctional slack-fill and is considered deceptive to reasonable consumers. There was (and is) no appellate decision in any circuit that dealt with these specific issues. Resolution of the issues therefore involved researching and analyzing conflicting district court opinions and statutory interpretation.

33. Plaintiffs earned this settlement after investing substantial time and personnel resources (accumulating a lodestar to date of $523,702.50), and advancing considerable costs (totaling $102,172.12). As discussed herein, Plaintiffs' request is reasonable given the exceptional result obtained after hard-fought litigation, the efforts of Class Counsel, and the costs incurred.

## II. BACKGROUND AND EXPERIENCE OF CLASS COUNSEL

34. Our firm is comprised of highly-respected and experienced leaders in the field of consumer class action litigation.

35. I graduated from the Michigan State University School of Law, *summa cum laude*, in 2005 and received my B.A. from University of Michigan at Ann Arbor in 1999.

36. Prior to founding Clarkson Law Firm, P.C. (and its predecessor firm) in 2011 and serving as its managing attorney, I was a senior associate at a prominent Southern California class action firm where I exclusively litigated consumer class actions against pharmaceutical companies, insurance carriers, food manufacturers, and other consumer goods manufacturers. Clarkson Law Firm, P.C. has focused on large-scale class action litigation from its inception.

37. The following are some of my representative cases:

   a. ***Fluoroquinolone Antibiotic Cases***. I was the first attorney in the country to take on clients in connection with claims for permanent and disabling nerve damage caused by

Levaquin, Cipro, and Avelox antibiotics manufactured by Johnson & Johnson and Bayer Pharmaceuticals. Mr. Clarkson represents dozens of clients across the country.

      b.   ***Garcia v. Iovate et al.*, Santa Barbara Superior Court, Case No. 1402915**. I successfully intervened in this case on behalf of a class of consumers of the popular "Hydroxycut" weight loss supplement and, along with the efforts of co-counsel, increased the size of the settlement by more than ten-fold to a total settlement value of over $10 million.

38. My law partner Shireen M. Clarkson received her Juris Doctorate from University of California Hastings College of the Law in 2004. Prior to joining Clarkson Law Firm, P.C., she was a senior associate at a prominent Southern California class action firm where she also exclusively litigated consumer class actions and mass torts cases against pharmaceutical companies, insurance carriers, food manufacturers, and other consumer goods manufacturers. In 2014, Mrs. Clarkson joined Clarkson Law Firm P.C.

39. The following are some of Mrs. Clarkson's representative cases:

      a.   ***Imburgia, et al vs. DirecTV Inc.*, Los Angeles County Superior Court, Case No. BC398295**. Mrs. Clarkson was actively involved in obtaining class certification of a matter involving unlawful termination fees against the satellite television giant, DirecTV, and was among the attorneys appointed as co-lead class counsel for the certified class. Most notably, she played an integral role in defeating DirecTV's motion to compel arbitration following the United States Supreme Court's 2011 decision in *AT&T Mobility v. Concepcion* – the only case in the nation to overcome *Concepcion*'s broad impact on consumer contracts with arbitration provisions. Mrs. Clarkson participated in the further defeat of DirecTV's appeal in the Ninth Circuit. The decision was ultimately reversed by the United States Supreme Court, although Justices Thomas, Ginsburg, and Sotomayor filed dissents, consistent with plaintiffs' position, writing that the majority's decision "again expanded the scope of the FAA, further degrading the rights of consumers and further insulating already powerful economic entities from liability for unlawful acts."

      b.   ***Grair vs. Johnson v. GlaxoSmithKline, Inc.*, 166 Cal. App. 4th 1497 (2009), Los Angeles County Superior Court, Case No. BC288536**. While at her former law

firm, Mrs. Clarkson assisted in achieving a class settlement of over $3.5 million for a class of California consumers of the drug Paxil. This was a hard-fought lawsuit that spanned over the course of eight years. The settlement changed the general perception of sleeping pills which are no longer regarded as "non-habit forming" as falsely advertised by GlaxoSmithKline.

c.  *Penos vs. Zell, et al.*, **Los Angeles County Superior Court, Case No. BC398686**. Mrs. Clarkson assisted in uncovering Labor Code violations on behalf of employees in this certified class action lawsuit. She was an integral part of the discovery, briefing, and negotiations that ultimately led to a class action settlement of this matter, resulting in hundreds of thousands of dollars to the employee class.

40. A copy of my firm's resume, which includes more detailed information about our practice and the qualifications of the other Clarkson Law Firm, P.C. lawyers who worked on this case, is attached as **Exhibit 1**. Not included on my law firm's resume are four other slack fill cases my firm is prosecuting on behalf of consumer classes in California state and federal court involving theater box candy products against highly visible competitors in the confectionery industry.

### III.  CLASS COUNSEL'S LODESTAR AND EXPENSES

41. I have personally reviewed all of my firm's time entries, and have used billing judgment to ensure that duplicative or unnecessary time has been excluded and that only time reasonably devoted to the litigation has been included. The time and descriptions displayed in these records were regularly and contemporaneously recorded by me and the other timekeepers of the firm pursuant to firm policy and have been maintained in the ordinary course of business.

42. As of September 5, 2018, Clarkson Law Firm, P.C. expended 1,081.8 hours in this case. Clarkson Law Firm, P.C.'s lodestar fee in this case, based on current billing rates, is $523,702.50. Notably, my firm has not increased our billing rates since 2016 when billing on this matter commenced.

43. Our firm maintains a system for entering daily billing entries disaggregated by date, description, hours, amount, and Uniform Task-Based Management System ("UTBMS") Codes and Sub-codes, which will be made available for *in camera* review upon request of the Court.

Below is a summary chart of each of my firm's timekeepers who have billed to this matter, disaggregated by number of hours billed, billing rate, and total fees. Notably, I assigned as many tasks to lower-rate paralegals and associate attorneys as possible.

| Timekeeper (Year of Bar Admission) (Title) | Hours | Rate ($) | Total ($) |
|---|---|---|---|
| Ryan J. Clarkson (2005) (Managing Attorney) | 390 | 650 | 253,390 |
| Shireen M. Clarkson (2005) (Senior Partner) | 112.4 | 650 | 73,060 |
| Bahar Sodaify (2013) (Associate) | 462.6 | 375 | 173,860 |
| Shalini Dogra (2016) (Associate) | 8 | 290 | 2,320 |
| Rita Mansuryan (Law Clerk) | 6.6 | 245 | 1,617 |
| Brandon Mata (Law Clerk) | 7.3 | 245 | 1,788.5 |
| Lauren Mayes (Law Clerk) | 9 | 245 | 2,205 |
| Sarah Longalong (Litigation Support) | 57.3 | 180 | 10,314 |
| Stephanie Satow (Litigation Support) | 27.4 | 180 | 4,392 |
| Christine Williams (Litigation Support) | 1.2 | 180 | 216 |
| Totals | 1,081.8 | 484 | 523,702.50 |

44.     In addition to the time enumerated above, I estimate that Plaintiffs' counsel will incur dozens of additional hours of future work in connection with this case through final approval and to ensure the claims administrator satisfied its duties to the settlement class and the Court.

45.     Our firm maintains an itemized listing of the primary out-of-pocket expenses my firm incurred in this case disaggregated by date, description, amount, and Uniform Task-Based Management System ("UTBMS") Codes and Sub-codes, which will be made available for *in camera* review upon request of the Court. Plaintiffs' total litigation expenses of $102,172.12 were reasonably incurred in this case. These expenses are reflected in the records of Clarkson Law Firm, P.C., and were necessary to prosecute this litigation. All expenses were carefully and reasonably expended, and they reflect market rates for various categories of expenses incurred. Most of these expenses were incurred for expert opinions and testimony, court fees, survey fees, mediation fees, discovery costs, travel costs, copying costs, and courier costs. Expense items were billed separately and such charges were not duplicated in my firm's billing rates. Below is a summary chart of the litigation expenses by category:

| Category of Litigation Expenses | Total |
|---|---|
| Courier Services | $1,767.25 |
| Filing Fees | $842.60 |
| Airfare, Hotel, and Taxis | $6,040.23 |
| Copy Services | $1,951.40 |
| Discovery Management | $2,344.69 |
| Expert Fees | $78,527.38 |
| Deposition and Court Reporting Services | $6,863.64 |
| Mediation Fees | $3,783.33 |
| Total | $102,172.12 |

46. Our firm has prepared a chart setting forth the hourly rates charged for lawyers and staff at our firm. Based on my knowledge and experience, the hourly rates charged by my firm are within the range of market rates charged by attorneys of equivalent experience, skill, and expertise. These are the same hourly rates that we actually charge to our regular hourly clients who have retained us for non-contingent matters, and which are actually paid by those clients. I have personal knowledge of the range of hourly rates typically charged by counsel in our field in San Francisco, California, and throughout the United States, both on a current basis and in the past. In determining my firm's hourly rates from year to year, Mrs. Clarkson and I have consciously taken market rates into account and have aligned our rates with the market.

47. Through my practice, we have become familiar with the non-contingent market rates charged by attorneys in California. This familiarity has been obtained in several ways: (1) by litigating attorneys' fee applications; (2) by discussing fees with other attorneys; (3) by obtaining declarations regarding prevailing market rates filed by other attorneys seeking fees; and (4) by reviewing attorneys' fee applications and awards in other cases, as well as surveys and articles on attorney's fees in the legal newspapers and treatises. The information we have gathered shows that our firm's rates are in line with, and in fact less than, the *non-contingent* market rates charged by attorneys of reasonably comparable experience, skill, and reputation for reasonably comparable

class action work. In fact, comparable hourly rates have been found reasonable by various courts for reasonably comparable services, including:

    a.    *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. M 07 1827 SI, MDL, No. 1827 (N.D. Cal. 2013), an antitrust class action, in which the court found blended hourly rates of $1000, $950, $861, $825, $820, and $750 per hour reasonable.

    b.    *Williams v. H&R Block Enterprises, Inc.*, Alameda County Superior Ct. No. RG08366506, Order of Final Approval and Judgment filed November 8, 2012, a wage and hour class action, in which the court found the hourly rates of $785, $775, and $750 reasonable for the more senior counsel.

    c.    *Luquetta v. The Regents of the Univ. of California*, San Francisco Superior Ct. No.CGC-05-443007, Order Granting Plaintiff's Motion for Common Fund Attorneys' Fees and Expenses, filed October 31, 2012, a class action to recover tuition overcharges, in which the court found the hourly rates of $850, $785, $750, and $700 reasonable for plaintiffs' more experienced counsel.

    d.    *Pierce v. County of Orange*, 905 F. Supp. 2d 1017 (C.D. Cal. 2012), a civil rights class action brought by pre-trial detainees, in which the court approved a lodestar- based on, *inter alia*, rates of $850 and $825 per hour in 2011.

    e.    *Holloway et. al. v. Best Buy Co., Inc.*, No. 05-5056 PJH (N.D. Cal. 2011) (Order dated November 9, 2011), a class action alleging that Best Buy discriminated against female, African American and Latino employees by denying them promotions and lucrative sales positions, in which the court approved lodestar-based rates of up to $825 per hour.

    f.    *Californians for Disability Rights, Inc., et al. v. California Department of Transportation, et al.*, 2010 U.S. Dist. LEXIS 141030 (N.D. Cal. 2010), adopted by Order Accepting Report and Recommendation filed February 2, 2011, a class action in which the court found reasonable 2010 hourly rates of up to $835 per hour.

    g.    *Credit/Debit Card Tying Cases*, San Francisco County Superior Court, JCCP No. 4335, Order Granting Plaintiffs' Motion for Attorneys' Fees, Expenses, and Incentive Awards, filed August 23, 2010, an antitrust class action, in which the court, before applying a 2.0

lodestar multiplier, found reasonable 2010 hourly rates of $975 for a 43-year attorney, $950 for a 46-year attorney, $850 for 32 and 38 year attorneys, $825 for a 35-year attorney, $740 for a 26-year attorney, $610 for a 13-year attorney, and $600 for a 9-year attorney, and $485 for a 5-year attorney.

48. The reasonableness of my firm's hourly rates are also supported by several surveys of legal rates, including the following:

a. In an article entitled "On Sale: The $1,150-Per Hour Lawyer," written by Jennifer Smith and published in the Wall Street Journal on April 10, 2013, the author describes the rapidly growing number of lawyers billing at $1,150 or more revealed in public filings and major surveys. The article also notes that in the first quarter of 2013, the 50 top-grossing law firms billed their partners at an average rate between $879 and $882 per hour. A true and correct copy of this article is attached hereto as **Exhibit 2**.

b. In an article published April 16, 2012, the Am Law Daily described the 2012 Real Rate Report, an analysis of $7.6 billion in legal bills paid by corporations over a five-year period ending in December 2011. A true and correct copy of that article is attached hereto as **Exhibit 3.** That article confirms that the rates charged by experienced and well-qualified attorneys have continued to rise over this five-year period, particularly in large urban areas like the San Francisco Bay Area. It also shows, for example that the top quartile of lawyers bill at an average of "just under $900 per hour."

c. Similarly, on February 25, 2011, the Wall Street Journal published an on-line article entitled "Top Billers." A true and correct copy of that article is attached hereto as **Exhibit 4**. That article listed the 2010 and/or 2009 hourly rates for more than 125 attorneys, in a variety of practice areas and cases, who charged $1,000 per hour or more. Indeed, the article specifically lists *eleven* (11) Gibson Dunn & Crutcher attorneys billing at $1,000 per hour or more.

d. On February 22, 2011, the ALM's Daily Report listed the 2006-2009 hourly rates of numerous San Francisco attorneys. A true and correct copy of that article is attached hereto as **Exhibit 5**. Even though rates have increased significantly since that time, my firm's rates are well within the range of rates shown in this survey.

e. The Westlaw CourtExpress Legal Billing Reports for May, August, and December 2009 (a true and correct copy of which is attached hereto as **Exhibit 6**) show that as far back as 2009, attorneys with as little as 19 years of experience were charging $800 per hour or more, and that the rates requested here are well within the range of those reported. Again, current rates are significantly higher.

f. The National Law Journal's December 2010, nationwide sampling of law firm billing rates (a true and correct copy of which is attached hereto as **Exhibit 7**) lists 32 firms whose highest rate was $800 per hour or more, eleven firms whose highest rate was $900 per hour or more, and three firms whose highest rate was $1,000 per hour or more.

g. On December 16, 2009, The AmLaw Daily published an online article entitled "Bankruptcy Rates Top $1,000 in 2008-2009." That article is attached hereto as **Exhibit 8**. In addition to reporting that several attorneys had charged rates of $1,000 or more in bankruptcy filings in Delaware and the Southern District of New York, the article also listed 18 firms that charged median partner rates of from $625 to $980 per hour.

h. The hourly rates of all billing attorneys from my firm are less than the rates reflected in the Laffey Index *before adjustment* for the roughly plus-20% cost of living increase necessary for the San Francisco market over Washington, D.C. A true and correct copy of the Laffey Index is attached hereto as **Exhibit 9**. The methodology of calculation and benchmarking for the Laffey Matrix has been approved in a number of cases. *See, e.g.*, *McDowell v. District of Columbia*, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); *Salazar v. Dist. of Col.*, 123 F.Supp.2d 8 (D.D.C. 2000).

49. Given Clarkson Law Firm, P.C.'s track record of success, our firm's hourly rate for partners is set at $650, which is the same rate that my firm charges to clients who retain us on an hourly basis and comprises about 10% of our billings.

50. No court has ever cut my firm's fee application by a single dollar on the ground that our hourly rates were not reasonable.

51. My firm undertook this representation on a wholly contingent basis recognizing that the risk of non-payment has been high throughout this litigation. There were some uncertainties in

the viability of this case as a class action, as well as uncertainties in the merits of the underlying claims. Although we believed the case to be meritorious, a realistic assessment shows that the risks inherent in the resolution of the liability issues, protracted litigation in this action as well as the probable appeals process, were great. Indeed, as a result of taking on Mr. Iglesias' case, my firm turned down other potentially profitable matters, including hourly work, and devoted resources to this case that could have been devoted to other potentially income-generating matters.

52. Had we not resolved this matter through settlement, we would have vigorously prosecuted the case through class certification, summary judgment, trial, and appealed any determinations that may have been adverse to the class's interests. We were therefore at great risk for non-payment. In addition, as described above, we have advanced significant expenses that would have continued to grow and would not have been reimbursed absent a successful result.

53. Due to the commitment of time and capital required to litigate this action, my firm had to forego significant other work from the beginning late-2016 through the present, including work for paying clients billed by the hour on a non-contingent basis, as well as other class action cases.

## IV. THE CLASS REPRESENTATIVE'S ROLE IN THIS LITIGATION

54. Plaintiff requests approval of incentive awards of $5,000 each for their service. In light of his efforts, this request is exceedingly reasonable.

55. Under California law, it is well-established that named class representatives are eligible for reasonable incentive payments. *See Munoz v. BCI Coca-Cola Bottling Co. of Los Angeles*, 186 Cal.App.4th 399, 412 (2010); *In re Cellphone Fee Termination Cases*, 186 Cal.App.4th 1380, 1393 (2010); *Clark v. American Residential Services LLC*, 175 Cal.App.4th 785, 804-06 (2009); *Bell v. Farmers Ins. Exch.*, 115 Cal.App.4th 715, 726 (2004); *Newberg* § 11:38 (4th ed. 2008). These awards are discretionary, and "the rationale for making enhancement or incentive awards to named plaintiffs is that they should be compensated for the expense or risk they have incurred in conferring a benefit on other members of the class." *Clark*, 175 Cal.App.4th at 806; *see also Munoz*, 186 Cal.App.4th at 412. Such awards compensate class representatives and others for actual costs in time, money, and the disruption of life incurred in the prosecution of

the litigation. They also serve to encourage future plaintiffs to come forward and vindicate the rights of other injured parties.

56. Here, the involvement of class representative Mr. Iglesias was critical to the prosecution of the case. Throughout the litigation, Mr. Iglesias held regular meetings with my firm by phone, in person, and through email to receive updates on the progress of the case, to discuss strategy, and to review and approve documents for filing. He assisted in my firm's pre-lawsuit investigation by providing information regarding his background and purchase information.

57. Mr. Iglesias coordinated with my firm to form responses to discovery requests, including written documents requests, and he searched for responsive documents. Mr. Iglesias also sat for a full-day deposition. He was intimately involved in the settlement process, and has continued to keep abreast of settlement progress to date.

58. Mr. Iglesias assisted in the drafting of pleadings and papers, including complaints, class certification motion, opposition to motions to dismiss, and hey reviewed each for accuracy before they were filed.

59. Mr. Iglesias also took significant time away from work and personal activities to initiate and litigate this action. He was prepared to litigate this case to a verdict if necessary. His dedication and efforts have conferred a significant benefit on millions of purchasers of the products across the United States and the general public.

60. In light of his contributions and efforts, an incentive award of $5,000 for acting as the class representative is appropriate and should be approved. Mr. Iglesias' contributions are described in more detail in his declaration, filed herewith.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed on September 6, 2018 at Los Angeles, California.

_____
Ryan J. Clarkson, Esq.